UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

KARLA McADAMS,                                        :

                Plaintiff,            :

      -against-                              :          **OPINION AND ORDER**

UNITED STATES OF AMERICA,                 :          04 Civ. 6541 (FM)

             Defendant.            :

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

I.    <u>Introduction</u>

        This negligence action is brought by plaintiff Karla McAdams

("McAdams") against defendant United States of America (the "Government") under the

Federal Tort Claims Act ("FTCA" or "Act") to recover damages for injuries she sustained

as a result of a slip and fall in front of the United States Post Office ("Post Office") in

Roscoe, New York, on the morning of February 19, 2003.

        A bench trial was held on May 1 and 2, 2006.  This Opinion and Order sets

forth the Court's post-trial findings of fact and conclusions of law pursuant to Rule 52(a)

of the Federal Rules of Civil Procedure.  For the reasons that follow, judgment shall be

entered in favor of McAdams and against the Government in the amount of $30,000.

II.   Findings of Fact

    A.   Sidewalk Cleanup

        The Roscoe Post Office's official hours are 8 a.m. to 5 p.m. (Tr. 25).[1]
Nonetheless, the practice at the Post Office is that the first employee to arrive opens the
front door at approximately 7:30 a.m. to allow customers access to their post office boxes.
(Id. at 22). On the morning of February 19, 2003, Sally Meola ("Sally"), a fourteen-year
employee of the Post Office, was the person assigned this task since she was scheduled to
begin work at 7 a.m. (Id. at 23, 25, 164). Sally actually arrived at the Post Office at
approximately 5:30 a.m., by which time there were approximately one and one-half to
two inches of snow on the ground. (Id. at 166, 168). She proceeded to salt and shovel the
sidewalk around the Post Office over the next forty-five minutes or so. (Id. at 166-67).

        Sally's husband, James Meola ("James"), had an oral agreement with the
Roscoe Postmaster pursuant to which he was paid $40 to plow the Post Office parking lot
whenever it snowed. (Id. at 64, 75-76). The prior Postmaster also evidently had entered
into an agreement to pay Sally's son $20 to shovel the sidewalk outside the Post Office on
his way to school, but it is unclear whether it is Sally's son or James who is paid by the
current Postmaster, Robert DelGaizo ("DelGaizo"), to perform this work. (Id. at 76, 178-
79). In any event, it is not disputed that it was Sally – not her son or James – who

_____

        [1]    "Tr." refers to the transcript of the two-day bench trial. "J. Ex." refers to the
parties' joint exhibits.

shoveled the sidewalk on the morning of February 19, 2003, and that none of the Meolas received any payment as a result.  (<u>Id.</u> at 63, 65, 166, 186-87).

The evidence further establishes that both Sally and other postal employees would periodically shovel and salt the sidewalk during their working hours.  (<u>Id.</u> at 179-81).  Additionally, at least one of the other postal employees, Jim Bowers ("Bowers"), who is a rural carrier, would shovel and salt the sidewalk if he arrived at the Post Office before anyone else.  (<u>Id.</u> at 75, 184-85).  For these reasons, it is clear that when she was shoveling the sidewalk, Sally clearly was performing a duty assigned to employees of the Post Office.

B.    <u>Accident</u>

McAdams is a Roscoe resident.  (<u>Id.</u> at 106).  On the morning of February 19, 2003, she arrived at the Post Office at approximately 7:55 a.m., to retrieve her mail from her post office box.  (<u>Id.</u> at 106-07).  She parked her car in the street, as she generally did, alighted, and then walked around her car to the Post Office sidewalk.  (<u>Id.</u> at 107-08).  In doing so, she ignored a sign which read, "PLEASE USE CUSTOMER PARKING LOT."  (<u>Id.</u> at 86; J. Exs. 1-B, 1-D).  That sign was mounted on the front of the Post Office because it was dangerous for postal customers to park on the side of what was "basically a highway" when visiting the Post Office.  (Tr. 86).

Once on the sidewalk, McAdams slipped on something that felt like "smooth ice" and fell on her back.  (<u>Id.</u> at 108-09).  McAdams did not see any ice on the sidewalk as she was not looking down at the time of her fall.  (<u>Id.</u> at 131-32).  After her

fall, McAdams felt excruciating pain in her right ankle, which was turned in an unnatural position. (Id. at 109, 116).

While McAdams was on the ground, an unidentified woman approached her to ask her if she needed help. (Id. at 111-12). After the woman entered the Post Office, two men came outside and carried McAdams inside, where they placed her in a chair and elevated her foot. (Id. at 112-13). McAdams then spoke to Sally, whom she knew. She told Sally that she needed to call her employer. (Id. at 113-14).

Shortly after she was brought into the Post Office, an ambulance arrived and took McAdams to the emergency room at Catskill Regional Medical Center. (Id. at 114-15, 236; Pl.'s Ex. 30). Even before the ambulance arrived, Sally went outside the Post Office to take photographs.[2] (Id. at 172-73). One of the photographs of the sidewalk where McAdams fell depicts an area which is darker than the rest of the sidewalk. (See J. Ex. 5). That photograph also depicts some bushes and a man standing on the sidewalk. I find that the darker area reflects the presence of ice, rather than an accumulation of rock salt, or a shadow caused by the bushes on the side of the Post Office or the man standing nearby, as the Government's witnesses sought to suggest.[3]

---

[2]     At the trial, DelGaizo testified that Sally took the pictures, contradicting his deposition testimony that he was the photographer. (Id. at 42-43, 46-52).

[3]     DelGaizo testified that the darker area was a shadow caused by the bushes on what he described as the north side of the Post Office. (Id. at 98-99). Sally testified, however, that the front of the Post Office faces east. (Id. at 175). If so, the darkened area cannot possibly be a shadow since an object generating it in the morning would have to be on the right side of the photograph, not the left. (See J. Ex. 5). Moreover, meteorological records show that the sky was overcast that day. (J. Ex. 24).

In finding that the area was ice, not a shadow, I reject the testimony of both Sally and DelGaizo that there could not have been any ice on the sidewalk because they inspected the sidewalk shortly after McAdams' fall and did not observe any ice. (Tr. 55, 173-74). First, with respect to DelGaizo, his testimony that he took the accident scene photographs, which he later rescinded, establishes that his recollection of the day in question was far from perfect. Second, Sally testified that on the day of the accident, she was not aware of the exact location of McAdams' fall. (Id. at 171-72). If so, she may not have been looking in the right place.[4] Additionally, because she had shoveled the walk that morning, she had an interest in finding that there was no ice there following the accident.

C.     Injuries and Medical Treatment

At the hospital, McAdams initially was examined by an emergency room doctor who ordered x-rays. (Id. at 238-39). Those x-rays, in turn, disclosed a fracture dislocation of McAdams' right ankle. (Id.). McAdams then was examined by Dr. Charles Peralo ("Dr. Peralo"), an orthopedist, who found that she had sustained a number of injuries as a result of her fall on the ice, including a dislocation of the joint of her right ankle, fractures to her right tibia, and a significant fracture to the right lateral fibula bone.

---

[4]     I note further that the Government proffered in its opening statement that Bowers would testify that "he looked at the sidewalk prior to starting his shift on the morning of the accident, and . . . that the sidewalk was bare and had been sprinkled with rock salt." (Id. at 13). Thereafter, however, Bowers was not called to testify.

(Id. at 234, 239-40, 257).  Dr. Peralo performed a closed reduction.[5]  (Id. at 240).  Once he was satisfied with the fracture's alignment, as confirmed by x-rays, Dr. Peralo placed a hard cast on McAdams' lower right leg from her knee to the base of her toes to hold in place and maintain the alignment of the fracture.  (Id. at 117, 241).  McAdams remained in that cast until April 11, 2003, a period of a little less than two months.  (J. Ex. 17). McAdams was given crutches in the emergency room and was instructed not to put any weight on the fracture until it was fully healed.  (Id. at 243; J. Ex. 12).

While she was in a cast, and thereafter, McAdams made a series of visits to Dr. Peralo at his orthopedic office.  (Tr. 242-43, 246, 249; J. Exs. 13-18).  Although Dr. Peralo had mentioned surgery during the emergency room procedure as an option if the alignment of the fracture changed, McAdams in fact achieved an adequate alignment with no subluxation of the ankle joint.[6]  (Tr. 241-42, 244-46; J. Exs. 11, 13–17).  Accordingly, Dr. Peralo never recommended surgery.  (Tr. 242, 244-45, 260).

On May 9, 2003, Dr. Peralo determined that McAdams' fracture was fully healed, and on June 6, 2003, he discharged her from his care, finding that she had good range of motion and no significant complaints.[7]  (Id. at 249; J. Exs. 18, 20).

---

[5]    He actually had to perform that procedure twice since he was unhappy with the appearance of the joint after his first attempt to realign the ankle.  (Id. at 240-41).

[6]    "Subluxation" is an incomplete or partial dislocation.  Sloane-Dorland Annotated Medical-Legal Dictionary ("Dorland") 676 (1987)

[7]    In the interim, McAdams began physical therapy sessions at Catskill Rehabilitation and Sports Medicine on April 22, 2003.  (Tr. 208-10; J. Ex. 19).  Her final visit to that facility was on June 16, 2003, after she had been treated only six times.  (J. Ex. 19).  During

McAdams returned to Dr. Peralo's office on November 8, 2004, about one and one-half years after her discharge (and less than three months after this suit was filed). (J. Exs. 21 (Compl.), 22). At that time, McAdams complained of pain, tenderness and swelling in her right ankle. (Tr. 249-50, J. Ex. 22). McAdams also complained that her ankle would periodically "give out," causing her to fall. (Tr. 252; J. Ex. 25).

While she was in the courthouse for the trial, McAdams walked with a cane whenever she stood up. Although her gait struck me as feigned, she testified that she has continuing pain which "has gotten so bad that [she] can't walk anywhere or do anything without being in pain," and that the pain keeps her from sleeping at night. (Tr. 125, 128). She also testified that she has not been able to bowl and "can't do anything really" since the date of the accident. (Id. at 128, 136).

Simply put, McAdams lied under oath. As the secretary of the Tri-State Bowling Association confirmed, during the 2003-04 season, which ran from September 2003 to March or April 2004, McAdams bowled a total of 183 games in two leagues. (Id. at 139-41). In the following season, she bowled 105 games in the two leagues, achieving a high score of 196. (Id. at 142, 145). Faced with this testimony, McAdams admitted that her prior testimony was incorrect when she was recalled to the witness stand by her counsel. (Id. at 231). She nevertheless maintained that she stopped bowling in or around December 2004. (Id. at 231-32). This was a few months after this suit was filed.

these sessions, McAdams was taught stretching exercises to improve the range of motion in her right ankle, and she also did foot exercises. (Tr. 125, 212-13).

By her own admission, McAdams embellished her testimony. Her purpose, quite obviously, was to make the consequences of her injury seem more serious than they actually were. The question therefore becomes, how extensive are McAdams' injuries and what is her prognosis? On these issues, the two sides' experts sharply disagreed.

When he examined her in late 2004, Dr. Peralo found crepitation[8] and swelling. (Tr. 250; J. Ex. 22). Dr. Peralo further found that McAdams' pain was caused by posttraumatic arthritis which led to bone-on-bone contact. (Tr. 250-51). Dr. Peralo also found narrowing and lipping along the medial aspect of the tibia, which he considered further evidence of the arthritic changes taking place. (Id. at 246). Other signs of arthritic changes that he found were spur formation, sclerosis, cyst formation in the bone, and incongruity of the posterior tibia. (Id. at 247). Finally, Dr. Peralo found that McAdams' ankle was routinely "giving out" because of soft tissue damage caused by the dislocation of her ankle. (Id. at 252-53).

On the other hand, the medical examination performed by orthopedic surgeon Dr. Brian Weiss ("Dr. Weiss"), at the request of the Government, led to a finding of only a mild restriction of motion in McAdams' right ankle, and no posttraumatic arthritis. (Id. at 290, 292-94). Dr. Weiss testified that the joint space or cartilage interval of a healthy ankle joint measures four millimeters, and he opined, contrary to Dr. Peralo, that x-rays of McAdams' ankle taken between November 2004 and January 2006 showed

---

[8]    "Crepitation" is the noise made when the ends of a fractured bone are rubbed together. Dorland at 172.

no reduction in that space, and, hence, no bone-on-bone contact or arthritis.  (Id. at 292-94; J. Ex. 11).  Dr. Weiss further explained that small spurs on the inner, outer or back side of an ankle were not indicative of posttraumatic arthritis since they normally occur after any fracture, no matter how minor.  (Tr. 293).

Dr. Weiss concluded that McAdams' three-millimeter displacement of the posterior tibia was not caused by posttraumatic arthritic changes, but by improper alignment of the ankle following the closed reduction performed by Dr. Peralo.  (Id. at 291).  In Dr. Weiss' opinion, the displacement might have been less had surgery been performed rather than the closed reduction.  (Id.).  Additionally, he opined that such a surgery would have improved the joint surface, giving her a better functioning ankle.[9] (Id. at 303-04).  Significantly, Dr. Weiss noted that McAdams' alleged symptoms and Dr. Peralo's findings were contradictory since arthritic changes would lead to stiffness of the ankle, rather than its "giving out."  (Id. at 301).

I consider Dr. Weiss' testimony a more accurate reflection of McAdams' present condition than Dr. Peralo's testimony.  Indeed, having reviewed the January 2006 x-ray, I conclude that Dr. Weiss is correct that McAdams' ankle joint has not deteriorated, and that there is no bone-on-bone contact resulting from her injury.  Thus, the credible evidence shows that McAdams has only a slight limitation of motion, which

---

[9]        Nonetheless, Dr. Weiss conceded that surgery always can lead to potential complications, and that a second surgery might have been necessary to remove any hardware installed in McAdams' ankle.  (Tr. 320).

may cause her discomfort during certain activities, but that she is not subject to any substantial lingering restrictions on her activities, and has made a good recovery from her accident.

D.   Lost Income

At the time of the accident, McAdams was working as a proofreader and data entry clerk at Ross Industries in Liberty, New York.  (Tr. 105).  She testified that she then was earning approximately $420 per week before taxes.  (Id.).  She further indicated that she was out of work from February 19, 2004, until the third week of May 2003.  (Id. at 123).  Finally, she stated that she was paid a total of $1,700 in disability payments at the rate of $170 per week.  (Id.).  No documentary evidence to support any of these assertions was proffered at trial.

III.   Conclusions of Law

A.   Independent Contractor Defense

The "United States, as sovereign, is immune from suit, save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  United States v Mitchell, 445 U.S. 535, 538 (1980) (quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)). Under the FTCA, the United States waives sovereign immunity and becomes liable

> for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the

> claimant <u>in accordance with the law of the place where the act</u>
> <u>or omission occurred.</u>

28 U.S.C. § 1346(b) (emphasis added).  The Act defines an "employee" to include

officers or employees of a federal agency, and the term "federal agency" is in turn defined

to exclude "any contractor with the United States." <u>Id.</u> § 2671.  Consequently, the

Government cannot be held liable under the Act for the negligence of its independent

contractors. <u>See</u> <u>United States v. Orleans</u>, 425 U.S. 807, 814 (1976).  The Government

contends that the Court therefore lacks subject matter jurisdiction over this case because

Sally was acting as an independent contractor when she shoveled and salted the sidewalk

around the Post Office on the morning of February 19, 2003.  (Gov't's Post-Trial Br. at 2-

3).

　　　　Whether a person is an employee of the Government or an independent

contractor is a question of federal law.  <u>Leone v. United States</u>, 910 F.2d 46, 49 (2d Cir.

1990) (citing <u>Logue v. United States</u>, 412 U.S. 521, 528 (1973)).  A person meets the

definition of an independent contractor when the United States lacks the  "authority to

control [his] detailed physical performance." <u>Id.</u> (quoting <u>Logue</u>, 412 U.S. at 527-28).

　　　　It is undisputed that Sally is a Post Office employee.  The question is

whether she was acting within the scope of that employment or as an independent

contractor when she cleared the sidewalk on the morning of February 19, 2003, before the

Post Office opened.  Although Sally testified that the shoveling and salting of the

sidewalk were not part of her responsibilities as a postal clerk, and that her son had a

contract with the Postmaster to remove the snow on the sidewalk before the Post Office opened, there is no suggestion that she herself had such an independent contract with the Postmaster. Moreover, neither she nor her son were paid to shovel the sidewalk that morning. Indeed, she testified that she was <u>not</u> shoveling the snow for her son, but "was doing it for the [P]ost [O]ffice." (Tr. 181). That this was, in fact, part of her postal duties is further established by her testimony that her fellow postal employee, Bowers, would shovel the snow if he was the first to arrive in the morning.

Accordingly, I find that Sally was not acting as an independent contractor when she shoveled and salted the sidewalk on the morning of February 19, 2003. The Court therefore has jurisdiction under the FTCA to hear and decide McAdams' claim of negligence.[10]

B.    <u>Liability</u>

Under the FTCA, a federal court must look to the law of the state where the negligent act or omission occurred to determine the Government's liability. 28 U.S.C. § 1346(b)(1); <u>Caban v. United States</u>, 728 F.2d 68, 72 (2d Cir. 1984). In New York State, the elements of a negligence claim are "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." <u>Lombard v. Booz-Allen, & Hamilton, Inc.</u>, 280 F.3d 209, 214 (2d Cir. 2002) (citing <u>Merino v. New</u>

_____

[10]    Additionally, venue in this District is proper pursuant to 28 U.S.C. § 1402(b) because the accident occurred in Roscoe, New York, which is located in this District.

York City Transit Auth., 639 N.Y.S.2d 784, 787 (1st Dep't 1996), and Nathan W. Drage,

P.C. v. First Concord Sec., Ltd., 707 N.Y.S.2d 782, 787 (Sup. Ct. N.Y. County 2000)).

1.    Duty

To be liable for a slip-and-fall accident in New York State arising out of

snow and ice on a defendant's property, there must be a showing that the defendant

"created a dangerous condition or had actual or constructive notice of it."  Salvanti v.

Sunset Indus. Park Assoc., 813 N.Y.S.2d 110, 111 (2d Dep't 2006) (citing Cody v.

DiLorenzo, 757 N.Y.S.2d 789 (2d Dep't 2003)).  "To constitute constructive notice, a

defect must be visible and apparent and it must exist for a sufficient length of time prior

to the accident to permit the defendant's employees to discover and remedy it."  Gordon

v. Am. Museum of Natural History, 67 N.Y.2d 836, 837 (1986) (citing Negri v. Stop &

Shop, Inc., 65 N.Y.2d 625, 626 (1985)).

Here, as the accident scene photograph shows, the dangerous condition of

the sidewalk was apparent and visible to the naked eye at the time of McAdams' accident.

(See J. Ex. 5).  Moreover, given the weather conditions that morning, (see J. Ex. 24; Tr.

73), the icy condition necessarily must have existed for at least a few hours before

McAdams' fall.  In these circumstances, there was ample opportunity for a Post Office

employee to notice and remedy the condition prior to the arrival of any customers.

2.    Breach

Having shown that the Government had constructive notice of the

dangerous condition of the sidewalk, and thus owed her a duty of reasonable care,

McAdams next must establish that the Government breached its duty to her. In that regard, although Sally shoveled and salted the sidewalk on the morning in question, the accident scene photograph and McAdams' testimony show that the icy condition persisted.[11] The Government therefore breached its duty of care.

    3.    <u>Causation</u>

Having established that the Government breached its duty of care, McAdams also must establish that the breach was a proximate cause of her injuries. A proximate cause of an event is one, "which in a natural sequence, unbroken by any new cause, produces that event and without which that event would not have occurred." <u>Caraballo v. United States</u>, 830 F.2d 19, 22 (2d Cir. 1987) (quoting <u>Rider v. Syracuse Rapid Transit Ry. Co.</u>, 171 N.Y. 139, 147 (1902)); see also <u>Fonzi v. Beishline</u>, 705 N.Y.S.2d 470, 472 (4th Dep't 2000) ("The test for proximate cause is whether under all the circumstances, the chain of events that followed the negligent act or omission was a normal or foreseeable consequence of the situation created by the defendant's negligence.") (internal quotation marks and citation omitted).

Here, there is no evidence that McAdams' injuries were caused by anything other than her fall on the Post Office sidewalk. Although the Government sought to establish through the testimony of Dr. Weiss that it is "more probable that she tripped on

---

[11]    In reaching this conclusion, I attach no weight to the testimony of two other witnesses that the sidewalk outside the Post Office generally was well maintained. (<u>See</u> Tr. 195-96, 204-05).

something or jumped over an area of snow," twisting her foot as she landed, (Tr. 297), I credit McAdams' testimony that it was a patch of ice that caused her fall. The Government consequently is liable for the damages proximately caused by McAdams' fall.

C. <u>Damages</u>

 1. <u>Comparative Negligence</u>

"A plaintiff must exercise the reasonable care that a reasonably prudent person would use under similar circumstances to protect herself from injury." <u>Kane v. United States</u>, 189 F. Supp. 2d 40, 52 (S.D.N.Y. 2002) (citing <u>Kulaga v. State of New York</u>, 322 N.Y.S.2d 542, 545 (4th Dep't 1971)). When a plaintiff fails to do so, New York law requires that any damages award for personal injuries "be reduced by the percentage of 'the culpable conduct attributable to the claimant.'" <u>Caruso v. United States</u>, No. 01 Civ. 1207 (DRH), 2002 WL 31870571, at *4 (N.D.N.Y. Dec. 23, 2002) (quoting N.Y. C.P.L.R. § 1411 (McKinney 1997)). For this reason, the Government contends that any award of damages to McAdams should be reduced by the percentage of her own culpable conduct. (Gov't's Post-Trial Br. at 20).

In this case, since the ice patch should have been visible to Sally, McAdams also should have seen it prior to her fall. Accordingly, McAdams' own negligence in failing to observe and avoid the visible ice on the sidewalk was a proximate cause of her injuries. Although I do not expressly rely upon it, I note that McAdams' decision to park

her car in the street, rather than utilizing the customer parking lot as a cautionary sign suggested, also contributed to her fall.

While the assessment of relative culpability is not an exact science, I find that McAdams bears one-third of the responsibility for the accident. Her recovery will therefore be reduced by 33-1/3 percent.

2.    Failure to Mitigate

Generally, an "injured party is under a 'duty to take reasonable steps to effect a cure for his injuries and to mitigate damages . . . and . . . in the main, one must follow the expert recommendation of his physician.'" Quadrino v. The SS Theron, 436 F.2d 959, 960 (2d Cir. 1970) (quoting Young v. American Export Isbrandtsen Lines, Inc., 291 F. Supp. 447, 450 (S.D.N.Y. 1968)). The Government contends that any damages awarded to McAdams therefore should also be reduced because she failed to mitigate her damages by undergoing surgery and prematurely terminated her physical therapy sessions. (Gov't's Post-Trial Br. at 21).

McAdams' failure to opt for surgery cannot result in a reduction of her damages for at least two reasons. First, as Dr. Weiss conceded, any surgery can lead to complications and a second surgery in this case might have been necessary to remove the hardware initially installed. (Tr. 320). It therefore was reasonable for McAdams not to embark on a course which might have required two surgical procedures. Second, and of far greater importance, Dr. Peralo never recommended that she have surgery. It therefore

verges on the ludicrous to suggest that McAdams should have requested an invasive procedure that her treating physician felt was not necessary.

Dr. Peralo similarly did not suggest to McAdams that she should continue her physical therapy.  (Id. at 134).  Indeed, although the Government called McAdams' physical therapist as a trial witness, it never elicited any testimony that her decision to terminate her treatment was contrary to the therapist's recommendation.  (See Tr. 207-13).  The Government therefore also has not shown that it was unreasonable for McAdams to discontinue her physical therapy when she did.

Accordingly, McAdams' recovery will not be reduced because of any alleged failure to mitigate her damages.

### 3.   Lost Wages

Under New York law, a claim for lost wages which is wholly unsupported by documentary evidence is insufficiently detailed or certain to warrant an award for past lost wages.  See, e.g., Hilaire v. White, 759 N.Y.S.2d 74, 75 (1st Dep't 2003); O'Connor v. Rosenblatt, 714 N.Y.S.2d 327, 327-28 (2d Dep't 2000); Faas v. State of New York, 672, N.Y.S.2d 145, 147 (3d Dep't 1998).  At trial, McAdams offered no such documentary proof.  She therefore is not entitled to any sum for lost wages.

### 4.   Pain and Suffering

"When determining the appropriate damages for pain and suffering, [the Court] is bound by a standard of reasonableness."  Mastrantuono v. United States, 163 F.

Supp. 2d 244, 258 (S.D.N.Y. 2001) (citing <u>Battista v. United States</u>, 889 F. Supp. 716, 727 (S.D.N.Y. 1995)).

Pain and suffering jury awards approved by New York courts for ankle fractures range from $16,000 to millions of dollars, depending on the extent of the injury, whether surgery was required, and whether the fracture resulted in permanent limitations. <u>See</u> <u>Palmieri v. Celebrity Cruise Lines, Inc.</u>, No. 98 Civ. 2037 (HBP) 2000 WL 310341, at *8-*10 (S.D.N.Y. March 27, 2000) (collecting cases). In his post-trial memorandum, McAdams' attorney has furnished five jury verdict abstracts related to ankle injuries. In four of the five cases, the injury was caused by a considerably more serious accident, such as a retaining wall falling on the plaintiff or being struck by a truck. (<u>See</u> letter from Jamie C. Rosenberg, Esq., to the Court, dated May 4, 2006). In the only slip and fall case that he cites, following a jury verdict of liability, the parties agreed to a $150,000 settlement for a bimalleolar fracture which apparently was treated nonsurgically. (<u>Id.</u> (citing <u>Iluz v. Samenhov</u>, No. 31221/01 (Sup. Ct. Queens County Sept. 16, 2004)).

Other cases have involved lower awards. <u>See</u> <u>Ordway v. Columbia County Agric. Soc'y</u>, 709 N.Y.S.2d 691, 693 (3d Dep't 2000) (award of $60,000 for past pain and suffering reasonable where plaintiff suffered a bimalleolar fracture dislocation of the ankle requiring two surgeries); <u>Morrisseau v. State of New York</u>, 696 N.Y.S.2d 545, 547-48 (3d Dep't 1999) (increasing award for past pain and suffering from $16,000 to $30,000 where plaintiff sustained fractures to both ankles and as a result was disabled for four months); <u>Lepore v. City of New York</u>, 685 N.Y.S.2d 52, 52-53 (1st Dep't 1999)

(increasing award for past pain and suffering from $20,000 to $75,000 where the plaintiff's ankle fracture required three hospitalizations, three surgical procedures, and physical therapy for two years); Carlino v. County of Albany, 577 N.Y.S.2d 689, 691 (3d Dep't 1991) (award of $50,000 for past pain and suffering reasonable where plaintiff suffered severe ankle fracture requiring surgical insertion and removal of metal screws).

Here, there is no question that McAdams suffered considerable pain -- which she described as a ten on a scale of one to ten – at the time she was injured. (Tr. 109). After Dr. Peralo performed a closed reduction of the fracture, he placed her leg in a cast, gave her crutches, and instructed her to keep weight off her leg. (Id. at 117). For the first three weeks after the accident, McAdams had to stay home and was unable to do anything but lay down and elevate her foot. (Id. at 119). She was prescribed Vicodin for the pain, but had to discontinue using it because it made her sick. (Id. at 119-20). She consequently had to endure continuing pain in her ankle, which she described as a seven on a ten-point scale. (Id. at 120).

McAdams also had difficulty leaving her second-floor apartment to attend her doctor's visits. (Id. at 120-21). In order to get up and down the stairs during the first few weeks after her injury, she had to sit on the steps and go forward or backward with the assistance of someone else who elevated her injured leg to prevent it from striking anything. (Id. at 121). During this time, her niece helped her with her household chores and personal sanitation. (Id. at 122). When McAdams returned to work in May 2003, she no longer was walking with crutches, but still had an air cast, which she described as

uncomfortable. (Id. at 124). Eventually, her injury healed, and McAdams was able to resume her normal activities, including bowling. At present, she has only a mild restriction of motion, and her daily activities remain substantially unimpaired.

Accordingly, I find that on the facts of this case, McAdams is entitled to an award at the lower end of the spectrum. She therefore is awarded a total of $35,000 for her past pain and suffering, and $10,000 for her future pain and suffering. As noted above, this award to McAdams will be reduced by 33-1/3 percent for her comparative negligence, resulting in a total award to her in the amount of $30,000.

## IV. Conclusion

For these reasons, judgment is hereby granted to the plaintiff Karla McAdams against the defendant United States in the amount of $30,000.

SO ORDERED.

Dated:    New York, New York
        June 22, 2006

/FRANK MAAS
United States Magistrate Judge

Copies to:

Jamie C. Rosenberg, Esq.
Law Offices of Jamie C. Rosenberg
Fax:    (212) 248-5387

Russell M. Yankwitt, Esq.
Office of the United States Attorney
Fax:    (212) 637-2702